May it please the Court, I'm Gordon MacDougall from Washington, D.C. I'm sharing the argument today with Jack Tucholsky of Missoula. And to take five minutes, he's going to take nine minutes. We're each reserving three minutes apiece for rebuttal. I'm dealing with the statutory issues. Can you hold on just one second, counsel? We need to check the timing here. I think we're off. Oh, I'm sorry. You break it into subparts. Okay. Forgive me. I'm sorry. Give him back the time there. I thought he was taking it up the whole time. Our wonderful clerk. She's fabulous. She's way ahead of us. You've got an invisible string on your tie. I'm dealing with the statutory issues. Hopefully, if this case is set back because of the wrong statutory construction, the environmental issues will be somewhat changed and they have to be looked at anew by the STB. Can I just ask you a question right off the top? Of course, this case has been going on forever. I think Methuselah was one of the original lawyers in this case. It's an important case. I understand that. My question is this. Let's assume for a moment that you make some really good points on the environmental area. I want to concentrate on the transportation ruling. That's what I'm hearing. Okay, because I'm having trouble seeing where they did not apply valid law as amended in order to reach this. That's what I want to deal with. Let's talk about that. There are a lot of issues, but I want to deal with the public convenience and necessity issue, which is the basic, most important single issue. And what the STB did here was depart from a long practice, in fact, the law since 1920, that there is no single test to determine the public convenience and necessity in a line construction case. And here the STB imposed a three-part test in both the pre-1996 legislation and in the post. Well, the post one, they added on the statutory presumption, they said, that all applications would be approved unless not inconsistent. And the three-part test is a very limited set of criteria. It's financial fitness. Second is public demand or need. And we never used to deal with public demand. It was always public need. And the third prong was competition would not be harmful for existing carriers. Isn't that public demand or need? That's what they said. Yeah, right. But that didn't used to be the test. The demand was not part even before. Is it your argument that the amendment simply doesn't apply here? No. This statute does apply to the first, the amended statute. That's the amended in 1980. Right. That does apply to the 1996 decision. And supposedly, we think it applies because of the savings clause to the 2007 decision, but it was a modification of the PCNN test in 2007 to add a public interest requirement, put that in there. And but if you set aside the first decision, I think the ballgame is pretty much over. And in this case, as far as the transportation issue is concerned, that's your major point, isn't it? You think you need to go back ab initio, start from scratch, and then you win on this issue, but otherwise you've got a problem in the transportation area. No. First, what they've done here is they've taken these three criteria, which are caught out of the blue. And they say then you take the environmental thing and weigh that against the public convenience and necessity test as now construed. And what has happened there is vital elements of the hard evidence under the PCNS and is now shifted to the environment. And that's how we got in the problem of the safety. That's why the 1996 decision had trouble because it was found after it got to court, BNSF, the largest firm, said it's not viable. They used it as it's not viable. Tongue River never did want that test. They did want the four-mile creek thing. They were opposed to it as well. But it came up by the STB environmental staff. They're the ones that concocted this unworkable line. And STB says, well, that's so what? You don't have to use it. But it's there. It can be transferred. The management can have a different idea later on. It could be a trolley line coming down to see the Indians. You know, it's not workable. And that's why, actually, they came back and have a new test. Are you arguing that the underlying law is wrong and therefore we don't even get into a discretion issue here? Yes, yes. No, wait a minute. We say the law of this public convenience and necessity is there. It's both before and after. It's modified a little bit, but it's there. What they have done, the STB has said, we're going to say that test is three factors. And that's new. It never has been. It's only been PCNN that they have declined to issue any specific criteria. What the STB has done is they've taken three criteria and thrown everything else that used to be in the PCNN now into the environment. And so it was the environmental staff that came up with this cockeyed scheme. Do you want to save some time on your rebuttal? Yeah, everybody likes these factor tests. Pardon? Say the world loves factor tests. Yes. The things like safety was part of the PCNN, so you had sound, engineering, weary labor, testimony. Is this line viable or is it not? Now the environmental staff, and it's a record, this is five, numbers 114 and 147, I believe it was 167. They informally decided, we know engineering better. And the major labor unions say, no, we're not going to use it, and we want you to set it aside and send it back to the STB to either use the old criteria or explain why there's going to have a three-part test. Good morning, Your Honors. My name is Jack Tucholsky. I'm here on behalf of Mark Fix, a rancher in the Tongue River Valley in the Northern Plains Resource Council. They are here because the approval of this railroad will subject their ranches and farms to condemnation. They understand the ultimate authority is with the STB to approve or deny the railroad, but they can hold the government to the highest standards accountable. And they believe that by doing an adequate environmental analysis, that when they finally get to the public need and convenience, that they might look at this differently. And the record in this case establishes that the environmental analysis is deficient under this circuit's NEPA precedent. For example, the Mile City fish hatchery, the endangered pallid sturgeon, the ranchers would like to see the sturgeon recovered. They would like to get them off the list. The reality is, though, they just don't want their land condemned. They're using the environmental law as a way to avoid that. Is that correct? Your Honor, of course they don't want their land condemned, but they also understand that at the end of the day, the Service Transportation Board has a lot of authority here. Right. Let's say I agree with a lot of what you have to say about the environmental arguendo. What's your best environmental point, from your perspective, since we don't have a whole lot of time? The record in this case is massive, so what's your best point? The Mile City fish hatchery, for example. The expert agencies here, the ones that deserve deference from this Court, are the Montana Department of Fish, Wildlife, and Parks. They know about fish. The Transportation Board knows about trains. Fish, Wildlife, and Parks, Army Corps, U.S. Fish and Wildlife Service all said, you don't have any data about how this train rumbling through this fish hatchery is going to destroy our recovery program. The railroad said, fine, we will do some testing. Rather than do the testing, they put it off as mitigation, so they don't have any data about how this train, 10, 20, 30 giant coal trains every day, is going to affect the breeding of the sturgeon at this hatchery. They have no data. They're going to do it as mitigation. Well, once the railroad is built, so what if we collect more data? What's your best case, Laflam? Laflam on data. O'Connor versus Burford for the general premise that you have to look before you leap. That's what NEPA is all about, and they haven't looked here. The same with sage grouts, which are about to get listed under the Endangered Species Act, pronghorn antelope, fish, water quality. They didn't collect the data. They put it in as mitigation. After they build the railroad, then they're going to start collecting. And that's backwards. NEPA is look before you leap. Another argument that we have briefed quite a bit has to do with agency expertise, and we certainly understand that this court is going to grant deference to the federal government. Under NEPA, there's not a battle of experts here. But the experts in this case are the Montana Department of Fish, Wildlife, and Parks. They're the folks that are on the ground. And if you look at the record and you look at their comments, you will see that time and time again they told the government, you don't have enough data to make a reasoned decision. And I won't go through each one of the different resources, but, you know, I think you're right. It is complicated, and the record is huge, and we've tried to set it out in our brief. The other point that I want to make has to do with the cumulative impacts of coal bed methane development. The Bureau of Land Management prepared a statewide environmental impact statement in 2002 and said it's reasonably foreseeable that there's going to be 10,000 to 26,000 new coal bed methane natural gas wells, most of them in the Tongue River Valley, right where the railroad's going to run. That's the reasonably foreseeable standard for cumulative impacts under NEPA. In 2002, the railroad was on hold. They wrote the STB and said, secretly, it wasn't public knowledge, but they wrote and said suspend any further review, we're out of money. And so the Bureau of Land Management then didn't analyze the railroad when it looked at the coal bed methane. It said if this railroad is really going to happen, there are going to be cumulative impacts to air quality, to water, to wildlife. But because the railroad is on hold, we're not going to look at it. Well, when the railroad came back to life and they did a new environmental analysis in 2006, the STB refused to use their sister agency's own reasonably foreseeable scenario. Even though the BLM, which I would submit again, is they're the expert agency here, knowing how much development is going to come from coal and from natural gas. And they said, this is foreseeable. And in the environmental impact statement, the Surface Transportation Board said, well, that's fine for them to say, but we think that that's too far of a timeline for us to do any analysis. Well, the analysis was already done by the Bureau of Land Management. It's a hundred some odd pages in an EIS that's already been approved and is operative. And they've just decided to cast a blind eye on that particular issue. And they have come up with some very, what I would call, strange rationale. They said, for example, well, we don't have to look at coal bed methane unless it's being drilled at the same time we're actually building the railroad. And there's no justification for that because both the railroad and the coal bed methane infrastructure, which is wells and roads and pipelines, they're going to be there for a long time. They're going to be there for more than five years. They're going to be there for decades. And so the impacts to wildlife, to air quality are also going to be there a long time. And there's no justification for just cutting things off arbitrarily. Sure, when you have to forecast the precision that's required of the agency goes down, and we recognize that. But you have to make some attempt to do that kind of analysis. And in this case, the government didn't do that analysis. The last human of impact that I want to address has to do with the coal mines. The purpose of this railroad is to haul coal. The tonnage forecasts that the government used to justify the railroad included these mines that are known as the Otter Creek Mines, the largest undeveloped coal reserves in the United States. And they said, we're going to build this railroad, it's going to run right next to the Otter Creek Mines because we're going to carry coal on our trains from Otter Creek. And then when it came time to say, okay, well, then you better look at Otter Creek along with the railroad since the two projects are related, they said, well, Otter Creek is just speculative. We don't have to look at that. Well, how can it be speculative if they have not only used the coal as part of the financial justification, they have maps of the mine, they know the state of Montana intends to lease the tracks at Otter Creek, and they know that there's 530 million tons of recoverable coal there. And so the agencies, time and time again, when faced with the opportunity to address the environmental impacts, they looked the other way. And with that, I will save the rest of my time for rebuttal. Thank you very much. Thank you. May it please the Court, my name is Virginia Strasser, and I represent the Surface Transportation Board and the United States of America. I will use 15 minutes of our time, and Mr. Coburn, who represents the Intervenor Railroad, will speak for five minutes. This case has been going on for a very long time, and the board looked at each application to build a railroad and to extend that railroad at the time that application was before it. It did an extensive environmental review each time. Ms. Strasser, I want to say, I don't know whether you've ever read any of my opinions, but I try to apply the law straight up on environmental issues, however it cuts. And I've got to say, I know the Surface Transportation Board has real expertise in terms of railroads, but I don't know who did this environmental stuff. It's almost like they didn't look at any of our cases. They didn't find out what happened with the Forest Service. They didn't have what we do with the Bureau of Land Management. So our case law is pretty clear about baseline information and all that sort of thing. And I honestly, I don't get it. I really don't. If you just take the baseline alone, it seems like in almost every instance the board says, well, we don't have the information now, but we're going to get it later. That's not our case law. That's not anybody's case law. No, Your Honor. I beg to disagree, though, that the record does not support what you've just said. I know that is Petitioner's argument, but that is not what's reflected in this record. Okay. Tell me where I'm wrong. If you will indulge me just quickly to go through where the record does discuss baseline. With regard to the fish hatchery, there's a 1999 and, again, a 2004 study of the vibration and noise impacts on the pallet sturgeon at the fish hatchery. That is quite current. There's a 2006 work plan that the State of Montana asked the railroad to comply with. That's not something that is deferred analysis. That's monitoring and implementation. With regard to the sage grouse, in Table 4-4 of the Tongue River III Draft Supplemental EIS, there's a table that shows the acreage, the nesting areas, and the brooding areas of the sage grouse. Okay. With respect. I could go on with each. You're picking out pieces of it, but let me give you an example here. Under the sage grouse comments, the STD said, among other things, that the location of the strutting grounds for Birney to the terminus of the proposed western alignment of the Spring Creek Spur are not well known, so potential impacts on grouse in this portion of the line are difficult to determine. They made no effort to find out. And the draft FSIES indicated with respect to the fish and aquatic resources, prior to construction of each rail segment, TRRC shall conduct a fish survey and fish habitat survey. The fish survey shall be conducted to estimate population and to monitor potential mortality or emigration due to construction impacts. A spawning habitat potential shall be conducted at each proposed bridge location. Yes, Your Honor. They may fly airplanes over a river as if they could determine the population of the fish and stuff. I mean, I admit they did some things, but they certainly did not appear to do what's required to do the NEPA evaluation. I would submit that the agency did do what's required by law under NEPA, and more than that. The duty of the agency is to disclose what the baseline conditions are, to address alternatives, and to consider mitigation. The agency did all of that. They didn't do the foreman. And, well, this Court has, in Silver Dollar Grazing Association case and in the Environmental Protection Information case, has said that a habitat study can serve as a proxy for actual population count. And that is what we had here. We had a habitat study for the fish. We knew what fish were in the Tongue River and in the streams by zone. We listed the species of fish. We knew what wildlife and what vegetation would be affected and disturbed by the building of this railroad. We listed those species. And that habitat is adequate as a proxy. What the agency then did is to say as mitigation, and there's incredibly stringent mitigation that we imposed on this railroad, 92 conditions. We said in order to fine-tune that mitigation and be sure closer in time to construction, that you do have a population count, and you know exactly what effects you're going to have at the right time of year prior to when you're going to begin building, you need to do further surveys. But there are also many direct mitigation measures that the agency imposed on this railroad because we did find significant impacts. The whole point of a discussion of baseline conditions is to come to a conclusion as to whether there will be impacts. Clearly the agency found impacts in each resource area that it imposed mitigation on or why impose that mitigation. It seems to me that the agency is being criticized rather than praised for having gone beyond what NEPA requires in that area. I would like to just turn, with the time I have, quickly to a few things that counsel said that I'd like to respond to. With regard to the fish hatchery, there is plenty of information that was before the agency. There was a 1999 study and a 2004 study on vibrations. And it is the state of Montana that asked for the work plan and asked Tongue River Railroad to comply with that work plan. We simply said, okay, if that's what you want, we will impose that as a condition. And the Fish and Wildlife Service, the federal agency that looked at the pallet sturgeon, there are no pallet sturgeon left in the Tongue River apparently. That is why this breeding plan in the fish hatchery is important. In its biological opinion, the Fish and Wildlife Service said, we concur that with the mitigation you propose that there will not be a significant impact on the pallet sturgeon at the fish hatchery. So we did have the expert agencies agreeing with us. And these are cooperating agencies that were a part of our entire environmental review every step of the way. With regard to CBM wells, in response to Mr. Tucholsky's comment, while the programmatic agreement in 2003 said there could be as many as 26,000 wells, that's a lot of wells in the state of Montana, in fact, it is BLM itself that studied the nine plans of development, or pods, if you will, that were brought forward as actual development plans. And with regard to each of those nines, it is BLM that came up with a finding of no significant impact on the environment. And those nine pods are maybe 1,000 wells, not 26,000. That is what was before the agency at the time. And it is appropriate for the agency to have taken into consideration BLM's own finding of no significant impact in its cumulative impacts analysis. I would also just like to point out in response to Mr. Gordon's comments that it is Tongue River Railroad that came up with the four-mile creek alternative in the Tongue River II case. The agency's environmental staff asked them if there was an alternative, but it is Tongue River that proposed it and said at the time they considered it a viable alternative. So the agency as well as others were surprised when after the agency decision came out in Tongue River II that Tongue River came back, railroad came back and said, we don't like this plan, please consider another alternative for the western alignment. So this is not something that we concocted. This is what the railroad brought to us. Turning the Court's attention, if I may, to other issues in this case, the agency had before it had asked for the concerns of the public. It had asked the other federal agencies that were cooperating agencies and the state agencies for their input throughout the process. It updated wherever it was relevant to update the analysis that it had done in the prior EISs. It is appropriate to supplement an EIS at the time that there is a change in the proposal, and that is exactly what the agency did. And the agency did use a consultant, as it always does, and that consultant works under the sole direction and control of the agency. I just want to clear that up because there are some suggestions in Northern Plains Brief to the contrary. That consultant works for the agency. Could I just focus you for just a moment? Mr. McDougall was upset with the three-part standard that the Board applied. Could you indicate wherein you disagree with his position and on what basis the Board used the three-part standard as currently drafted? Yes, Your Honor. The public convenience and necessity standard is the statutory standard. What Mr. McDougall appears to be critiquing is the agency's application of that standard in a given case, and the fact that the agency has come up with what it considers the three primary relevant considerations are the capability of the railroad to build and operate the proposed line, the public demand or need for that railroad, and whether it would affect existing carriers, business. And you said that the genesis of this is the statute. Was there a regulation promulgated in which these three criteria were laid forth? The agency has announced the standard through individual adjudications as it has the right to do. There's no need for an APA-type rulemaking. And contrary to what Mr. Gordon has said in his brief, this standard did not come up in the context of Tongue River II. It predates it. In a 1993 decision, Indiana and Ohio, which was not judicially reviewed, no judicial review was sought, in that 1993 decision, the Board also applied this standard of criteria. But it's not a standard. It's considering the relevant factors or criteria in deciding public convenience and necessity. So it's really no different than, say, our case law that over time establishes certain requirements in meeting Tongue River II. And clearly, since there is no statutory definition of how to interpret public convenience and necessity, courts will ordinarily defer to the agency's expertise in defining its enabling statute, and under Chevron II and recent Supreme Court decision, perhaps in the Mayo Foundation case, there's every reason to defer to the agency's Chevron deals with regulations, does it not? Deference in connection with construction. Not solely regulations, no, Your Honor. But it would apply to the case law. It would, Your Honor, yes. And the point is that there was substantial record evidence for the agency's decision here with regard to rail labor's interest and with regard to the environmental interest. We weighed, gave full consideration to those interests in looking for whether the public interest would be served and there would be a public benefit to this railroad. And we found that this public, that this railroad is in the public interest. Transporting coal by trucking is not a good option. And from an environmental point of view, it is certainly preferable to transport coal by rail. We looked at all of the environmental concerns here, and we have the authority to still decide, notwithstanding those environmental concerns and the mitigation we were imposing, to find that this railroad should be authorized. But I just want to point out that in this Indiana and Ohio 1993 ICC decision, that's at least one instance where the board did say the environmental and safety concerns outweigh the public, the PCN for this railroad, and denied the application. So we do take seriously the environmental and safety considerations and have, when it's appropriate, rejected an application on those grounds. If there are no further questions, thank you very much, Your Honors. Thank you. May it please the Court. I'm David Coburn, appearing for the intervener, Tongue River Railroad Company. Since, Judge Smith, you raised the baseline data issue and seemed to have some concerns, I'll address that first, if you will. The board here had ample data, a wealth of data, on the vegetation and on the animals, the whole biological survey of the area.  As Ms. Strasser said, it gathered it from ground surveys that were conducted in 1998, 1999, and 2003 at different times of the year. It gathered it from aerial surveys, but it also gathered it from a wealth of literature that was available. That literature was available from studies that were undertaken by mines in the area and that have to report data by others in the area. There was literature on the kind of fish in the Tongue River. There was no secret here as to what kind of animals and plants inhabited this area, and the board identified those animals and plants. It identified the potential impacts of the railroad with respect to those animals and plants. Nothing was missed. That's the problem of projections for five years but not farther. When the State and others had made it very clear this was a long-term project, it was clear where the wells would be located, where mines would be located. That was all well known. What's the railroad's response to that? On the five-year question? Correct. The railroad will be built in between two and a half and three years. I think the STB assumed three years, but it actually could be a little faster. It will be constructed within that period. It will be operated within the five-year frame for another two and a half to two years, depending on the length of construction. So the five years encompasses both a construction period and a period of operation. There's nothing to suggest that if you look beyond five years, you'd see anything different in terms of the operation of the railroad. With respect, that's not what we do, for example, with forests. If somebody wants to trim a forest, you look at what the long-term impact will be. In this case, if you go for five years and then you say we're not looking beyond that, does that really comply with our case law? Well, in terms of what the STB traditionally does with railroads, it complies with their case law. I don't question that. I guess what I've struggled with, as I mentioned to Mr. Strasser, is that I realize that the ICC is the oldest, as far as I know, the oldest regulatory agency in the United States government, at least that survives, and has real expertise in connection with railroads. I don't understand why the five-year distinction makes any sense here when you look at our case law in terms of what baseline information we require. Well, there's no indication, Your Honor, that the nature of the area was going to change after five years. Five years was about as clear a crystal ball as you could have. Well, let me give you this example. Let's assume that in the operation of the railroad that over a period of time, mitigation measures may take care of this, so this may be a silly example. Let's just say coal dust blows up out of the bins or something like that and it has a deleterious effect on the river or it has an effect on the neighbor's cattle or whatever. Again, it's hypothetical, but that could occur for 10 years, could occur for 15 years. I don't know, but it seems like that the STB did not do that. They didn't analyze that. But certainly the concept that it would continue was known to the state, known to the railroad, known to everybody. Help me with that, would you please? Sure. Well, the coal dust issue, for example, was looked at and the STB imposed mitigation. The STB always has the authority to the extent it finds that something, it may not have caught during an environmental review. The world is not perfect. It can always reopen. People can go back to the STB. They have authority to reopen. I get the mitigation part. What I'm concerned about, though, is that if the baseline information that was reviewed stops at five years, it's almost how can you impose appropriate mitigation measures if you don't look beyond five years to see what actually might happen and what mitigation measures might be required? Well, there's no indication here that anything the STB considered what would happen within the period of operation and the period of construction. There's no indication that something else that it didn't consider might not. But, again, with respect, you're all serious people here. I understand everybody's tried really hard. But I don't understand the arbitrary end date of five years, why it wasn't necessary to understand, at least from a baseline perspective, what's going to happen over this long period of time. There are lots of experts that look into these kinds of things, can tell you approximately what's going to happen when you have that. And interestingly enough, in most of these instances, at least as I've looked at it, it appears that much of the data was there. It just wasn't examined according to what I saw in the record on a post-five-year basis. Am I wrong? Respectfully, Your Honor, I think the data was there and it was examined. Again, a wealth of data. There were very many landowners, dozens of landowners along the right-of-way, and gaining access to their land was recognized to be a very difficult thing, so they did the best they could. I understand, but that doesn't change the fact that there's an obligation. If the landowner says, you know, I'm not going to let you in, then there are certain procedures that you take there, but the fact that they won't let you in doesn't change the fact that you still need to have the information. Isn't that right? We certainly require that, for example, in the Bureau of Land Management or the Forest Service. If you've got a private owner that's just outside the national forest or something, you're going to have an impact. You've got to find that out. And the Bureau of Land Management was consulted, as was the U.S. Fish and Wildlife Service, and a variety of other agencies, so that was part of the process. Were the landowners asked? The railroad is a very controversial railroad out there. I understand that, but my understanding is that a number of these owners were not even approached, so we don't know whether you could have gotten in or not. I'm not sure how many landowners, if any, were asked for access, but I think the decision was made that based on the literature that was available, based on the surveys that were done, the aerial surveys and the ground surveys, that a sufficient amount of information was known about the area in general. Well, we appreciate your good faith. I'm not questioning anybody's good faith. I've just been troubled, so thank you for that. Thank you. All right. Mr. Butler? I'll be very brief. The mention was as to who proposed this inoperable Four Mile Creek alternative, and the decision says, the first decision says, at the request of the board's section of environmental analysis, the railroad offered this route. The Four Mile Creek was not part of the application, was not heard before the hearing examiner. It was a staff thing, and the reason this case had been delayed so long is that when VNSF, Tongue River, the unions, everybody said this thing won't work, take the case back from this court, the STB objected because, in my opinion, their ego was involved because it was their proposal. When everybody wants this case back there, it sits here now for 10, 11 years because the STB staff didn't want to embarrass itself. It was their proposal. That's my judgment on the matter. Now, the other second point is on case law. If you look at the citation that they have in both decisions, nowhere is that Indiana and Ohio Railroad case mentioned. They didn't give any case citations for the three-part test. In their brief, in their part, they point out many cases where they and the Supreme Court have said there is no test for, single test for this public convenience and necessity. The summary of case law that we heard today is counsel's ex parte rationalization. It doesn't exist in the two decisions. If they want to say that to the case, let them say it on remand, but not through counsel or here today. Thank you. Judge Smith, I think you're absolutely right about the sage grouse as illustrative of what's going on with the CIS. There is no data in the record that shows that they went out on the ground and surveyed the LECs. The BLM in the comments on the draft, which is on page 49 of our brief, said, will you folks go out and take a look at two miles? Because once you build this railroad, those birds might be gone, and you might be able to site the railroad in a different place if you had the data. That's what NEPA does, and they refuse to go out and look. What happens in a situation like this where you have a number of ranchers and others who are opposed, but the railroad wants to come out and do some surveys, or the hired people come out and do some surveys, or the STB wants to do some surveys to determine about the grouse or whatever? What's the procedure there? Is it a normal and customary kind of thing? What rights does the STB have or the railroad? Your Honor, what legal rights they have I am not certain, but I am certain that if my clients did not allow them on, they would be hard-pressed or maybe even there would be an estoppel from saying, hey, you don't have the data. And Mark Fix has testified that he has never been approached. So basically your point is that had they asked to go on and your client said, no way, you're not coming on, they can't be heard to complain. But what really happened here from your perspective is they were never asked. There's nothing in the record to show they were asked. And then the other defense they use is the rough topography, and that's just ludicrous. I mean, they're going to drive D9 Caterpillars to build a railroad, but they say they can't get a biologist to walk down to see if there's rare plants or whatever. And so we just see excuse after excuse, and this circuit's case law requires site-specific information. Once they have that information, my burden gets more difficult. But they don't have the information. And I would just like to refer the Court and perhaps close with this. For the Miles City Fish Hatchery, the Montana State Fish and Game said, the study you have does not address vibration effects to egg survival, forage species, feeding behavior, fish physiology, elevated effects of train traffic. So they said the information doesn't even have this most basic data. And this is what the Surface Transportation Board said on page 31 of their 2007 decision. The Tongue River Railroad Company is concerned that the sort of studies sought by the Fish, Wildlife, and Parks Agency could significantly delay its construction schedule. So rather than get the data, they said, well, we're going to collect it as mitigation. And, of course, construction hasn't even commenced, and if they would have taken the time to do it, we may not be here today. Thank you very much, Your Honors. Thank you. What did you do with your glasses? That was pretty cool. CLIC.com. They're great for us guys that can't see a printed page anymore. We don't have any members of our court that have presbyopia, I can assure you. Yeah. You can buy them on the web, CLIC.com. Very handy. I'll get one today. We're all through? Yep. The court will adjourn or recess until tomorrow morning at 9 o'clock. All rise. This court for this session stands adjourned.
judges: Goodwin, Pregerson, M Smith